1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                   CENTRAL DISTRICT OF CALIFORNIA

10   SOO DUK KIM,                    )   CASE NO. CV 16-5071-PJW
                                     )
11              Petitioner,          )   MEMORANDUM OPINION AND ORDER
                                     )   DENYING PETITION, DISMISSING
12         v.                        )   ACTION WITH PREJUDICE, AND
                                     )   DENYING CERTIFICATE OF
13   SHAWN HATTON, WARDEN,           )   APPEALABILITY
                                     )
14              Respondent.          )
     _____)
15

16                                 I.

17                            INTRODUCTION

18        Before the Court is a Petition for Writ of Habeas Corpus under 28

19   U.S.C. § 2254.  For the reasons set forth below, the Petition is

20   denied and the action is dismissed with prejudice.

21                                 II.

22                        SUMMARY OF PROCEEDINGS

23   A.   State Court Proceedings

24        In 2012, after Petitioner was convicted of second degree murder

25   by a jury in Los Angeles County Superior Court, the California Court

26   of Appeal reversed his conviction because of instructional error and

27   remanded for a new trial.  (*See* Lodged Document No. 7 at 2.)

28   Petitioner was retried in 2013, and a second jury convicted him of

second degree murder. (Clerk's Transcript ("CT") 161.) The trial court sentenced him to 16 years to life in prison. (CT 182-83.)

Petitioner appealed to the California Court of Appeal, which affirmed the judgment in a written decision. (Lodged Document Nos. 5-7.) He then filed a petition for review in the California Supreme Court, which was summarily denied. (Lodged Document Nos. 8-9.) Thereafter, he filed habeas corpus petitions in the Los Angeles County Superior Court, the California Court of Appeal, and the California Supreme Court, all of which were denied. (Docket No. 10, Exhs. A-B; Docket No. 17, Exh. A; Docket No. 31, Exh. G; Lodged Document Nos. 11-16.)

B. <u>Federal Court Proceedings</u>

In July 2016, Petitioner, proceeding with the assistance of counsel, filed a habeas corpus petition in this court, pursuant to 28 U.S.C. § 2254, raising a single claim. In November 2016, the Court stayed the Petition to allow Petitioner to go back to state court to exhaust additional claims. On April 5, 2017, Petitioner filed an amended petition raising the following three claims:

1.  There was insufficient evidence to prove that he committed second degree murder.

2.  Trial counsel was ineffective for failing to present the expert witness's finding that Petitioner was in a psychotic state at the time of the killing.

3.  Trial counsel was ineffective for failing to request a jury instruction on the lesser included offense of involuntary manslaughter.

(*See* Docket No. 31, First Amended Petition ("Petition") at ii.)

The following statement of facts was taken verbatim from the California Court of Appeal's opinion affirming Petitioner's conviction:

## A. Prosecution's Case

In December 2007, Susan Kim lived in a two-story house on Raymond Avenue in Glendale. [Petitioner] was Kim's boyfriend and had moved in with her a year earlier.

[Petitioner] was unemployed and did not speak English very well. Kim's daughter, Jane Moon, attended college in San Diego but would periodically stay at Kim's house during weekends and winter and summer breaks. [Petitioner] made little effort to get to know Moon except when Kim was also present.

Moon was staying at Kim's home for winter break to attend two weddings on December 15, 2007. On that day, Kim confided in Moon that she wanted to "kick out" [Petitioner] from the house. Kim appeared scared when she confided in Moon.

On December 16, 2007, around 8:00 a.m., Moon was sleeping in an upstairs bedroom of Kim's house when she was awakened by the sound of Kim and [Petitioner] arguing in the downstairs hallway. Moon heard Kim "trying to kick [Petitioner] out," [Petitioner] saying "'Give me money and I will leave,'" and Kim responding "'Are you crazy?'" and "'Why would I give you money? It is my house. Get out.'" Moon heard [Petitioner] threaten Kim, "'What if I kill you

and then myself?'" Although [Petitioner] and Kim had
numerous heated arguments over the course of their
relationship, with both [Petitioner] and Kim yelling at each
other, Moon had never seen [Petitioner] strike or hit Kim
and had never heard [Petitioner] talk about killing Kim
before December 16, 2007.

After the argument ended, Kim went upstairs to Moon's
bedroom and apologized to Moon for waking her and telling
Moon to go back to sleep. Moon went back to sleep and woke
up a few hours later. Moon went downstairs to use the
shower connected to Kim's downstairs bedroom. When she
reached the bottom of the stairs and was in front of Kim's
closed bedroom door, Moon heard whispered arguing between
Kim and [Petitioner]. She could only hear parts of their
argument. In response to something that [Petitioner] said,
Moon heard Kim say, "Oh, so you are going to kill me?"
While Moon showered, she could not hear [Petitioner] or Kim.

After Moon showered, about 1:00 or 1:30 p.m., Moon
heard Kim and [Petitioner] arguing again. She heard them in
the kitchen and then in the driveway. Moon saw [Petitioner]
on the driveway throwing shoes and other items; Kim was
taking pictures and yelling at [Petitioner] that she was
going to call the police and get a restraining order.

[Petitioner] then left. Kim left the house to run
errands. At around 2:30 p.m., Moon's boyfriend, Christopher
Rivera, came to the house and the two prepared to leave to
run errands. Just as Moon and Rivera were about to leave,

4

Kim returned to the house. They left Kim alone at the house.

Between 3:00 and 4:00 p.m., one of Kim's neighbors saw [Petitioner] backing his white Lexus out of Kim's driveway and speed away, almost clipping the house, as he left. The neighbor described [Petitioner's] driving as "erratic and in haste" that afternoon, although [Petitioner] was usually a careful and calm driver. A couple days before, the neighbor had heard loud yelling from inside the home, sounding like an argument between a man and a woman, although he could only hear the man.

Another neighbor was outside on her driveway between 2:00 and 4:00 p.m., when she heard screeching tires and looked and saw [Petitioner] driving "crazily," backing out of the driveway in his white Lexus and leaving at a fast speed.

At around 6:00 or 6:30 p.m., Moon and Rivera returned to the house. Rivera stayed in the car while Moon went into the front door of the house to get the remote control for the gate from the kitchen. A few feet into the house, Moon saw Kim lying on the kitchen floor with a pool of blood around her and a kitchen towel over her face. Moon started yelling and Rivera came into the house and took Moon outside. Moon and Rivera called 911.

Glendale Police Officer Joshua Luna arrived at [Petitioner's] house at 6:45 p.m. and saw Kim's body lying on the kitchen floor. Homicide Detective Petros Kmbikyan examined the crime scene, documenting blood and blood

5

splatter and an indentation in the kitchen wall.  Kmbikyan
was present when the towel was removed from Kim's face,
revealing blood on her face, open eyes and a puncture wound
to the left side of her neck.  In the sink was a knife with
blood on it and a broken tip.  The knife appeared to belong
with those in a butcher block in the kitchen.

Lead Detective Arthur Frank, the investigating officer,
was also present and observed the crime scene.  Based on
[Petitioner's] vehicle and Department of Motor Vehicle
records, Frank sent Officer Michael Severo to conduct
surveillance at an address on Occidental.

Early in the morning the next day, December 17, 2007,
Police Officer Severo and his partner conducted surveillance
from an unmarked vehicle at an apartment complex on South
Occidental.  Around 4:00 a.m., on December 17, 2007, the
officers saw a white Lexus enter the subterranean garage and
Severo's partner left their vehicle and followed, hearing a
male and female talking but could not tell what was being
said.  Approximately five minutes later, a white Lexus left
the garage and the officers followed it to a motel on
Vermont.  Five to 10 minutes later, the white Lexus left the
motel and the officers followed it again.  The officers
stopped the vehicle which had one occupant, [Petitioner].
When [Petitioner] got out of the car, Officer Severo noticed
that he had a horizontal cut on his left wrist that was
coagulating and blood on the left side of his pants.
[Petitioner] was arrested and taken to the police station.

At the police station, Detective Frank was waiting for Detective Matthew Prokosch, the Korean translator, to arrive before interviewing [Petitioner] when [Petitioner] asked Frank in English, "'Is the girl dead? Is Susan dead?'" Detective Frank told [Petitioner] that they could talk about it later and continued to wait for a translator. Detective Frank noticed that [Petitioner] had minor lacerations or cuts on both of his wrists, which Detective Frank bandaged.

At about 7:00 a.m., [Petitioner] waived his *Miranda* rights and was interviewed by Detective Frank with Detective Prokosch translating.[1] [Petitioner] was cooperative and appeared remorseful. Detective Prokosch, trained in drug-recognition, observed that [Petitioner] did not exhibit signs of being under the influence of narcotics.

In his statement to the police, [Petitioner] indicated that at around 3:00 p.m., the day before, he and Kim had an argument in the kitchen. Kim found out that [Petitioner] was using marijuana and the day before Kim's death, Kim had taken away [Petitioner's] key. During the argument, [Petitioner] "unconsciously or unknowingly, unintentionally grabbed her head and hit her head against the wall a couple of times."[2] When [Petitioner] hit Kim against the wall, she screamed and fell down. Then [Petitioner] grabbed a knife

---

[1] The interview was tape recorded. The tape recording of the interview was played for the jury. A transcript of the interview is contained in the record. Detective Prokosch made notations on the transcript with corrections to the translation.

[2] At trial, Prokosch testified that the Korean word used by [Petitioner] could also mean "actions are automatic."

7

from a knife block in the kitchen and "unintentionally, or without him knowing" stabbed her in the stomach two or three times.

During the interview, Detective Frank began drawing a diagram of the kitchen so that they could talk specifically about the indentation in the wall, the knife block and the location of Kim's body. [Petitioner] saw what Frank was doing and offered to draw the diagram and began drawing. [Petitioner] drew the chairs that he and Kim were sitting in to eat when they argued. He identified the location of the wall that he pushed Kim's head into and confirmed that the hole in the wall was from when Kim hit her hea[]d. He indicated that the knife he grabbed was by the sink, and where it was in relation to the gas range. He indicated the location Kim fell down, confirmed that she was screaming while she was on the floor, and drew on the diagram where she was lying down when he got the knife and stabbed Kim while she was on the ground.[3] [Petitioner] told the police he left the knife in the sink and then drove away intending to kill himself.

Instead [Petitioner] met Choi Sookja, a woman he used to date, and she paid for a room at a Best Western motel on New Hampshire. In room 412, [Petitioner] changed out of his shirt before cleaning up the room and throwing it away into a trash can in the hallway. [Petitioner] told Sookja that

---

[3] Detective Frank who had been at the crime scene and observed the blood spatters opined that [Petitioner's] description of stabbing Kim while she was on her back with her stomach up was consistent with the blood splatter he observed in the kitchen.

8

he had killed Kim but Sookja did not believe him and said
that [Petitioner] was lying.

When asked why he got so angry during the argument,
[Petitioner] stated that Kim took his key and was "verbally
rude and abusive" and Kim had also told [Petitioner] in a
belittling manner to go to Korea and live with his mother
for six months.  [Petitioner] stated that Kim had seen him
taking out marijuana from his car several days earlier and
that they had talked several days earlier about not seeing
each other.

Homicide Detective Keith Soboleski went to the motel on
New Hampshire to see room 412.  In a trash can holding open
the door from the fourth floor stairwell to the hallway,
Detective Soboleski found a bloody towel, shirt, and
sweatshirt.  He also found a room key for room 412 in the
trash can.  In room 412, Detective Soboleski found what
appeared to be blood smears on the bed, blood droplets on
the bathroom floor, and some blood on the furniture.  The
room was checked out to a female named Ja Sook.  The
surveillance tape of the motel showed the arrival of a white
Lexus with two occupants, one male and one female, and the
female checking in at the front desk.

According to the medical examiner, Kim died from four
fatal stab wounds.  Specifically, two fatal stab wounds went
through her heart, one went through her lung and one of them
was five and a half inches deep and pierced both her heart
and left lung.  Kim also had two non-fatal stab wounds--a
two-inch wound to the neck and a superficial wound behind

her left ear.  In addition to the six stab wounds, Kim had a bruise on the back of her head.

**B. Defense's Case**

[Petitioner] did not testify in his defense.

Forensic psychiatrist Manuel St. Martin evaluated [Petitioner] for a mental disorder in 2008 and found that he suffered from schizophrenia.  Symptoms of the disorder include inability to plan and to speak in a way that would be understood by others.  According to Dr. St. Martin, these patients "strike out at others for no apparent purpose."  A schizophrenic that is not medicated loses touch with reality and hallucinations are often a sign.  The mere fact that one has such a disorder does not necessarily prevent one from forming malice aforethought.  However, an acute form of this disorder may prevent someone from forming malice aforethought.  Dr. St. Martin opined that [Petitioner] suffered from schizophrenia at the time of the commission of the offense.

As to a hypothetical involving a person who, as a result of verbal abuse over a period of "a day or two," yelled, threw things randomly, and broke glassware, Dr. St. Martin opined that the hypothetical subject showed signs of a person being in a psychotic state.  Dr. St. Martin indicated that someone in a psychotic state could also come out of it hours later.  When given a hypothetical involving a person who after killing someone, asked another woman to help him obtain a hotel room, and thereafter, in that room, changed out of the clothing worn during the time of the

crime, attempted to cut his own wrist, managed to leave the room with the woman to check into another hotel, and after encountering the police, gave a statement describing how and why they killed the victim, Dr. St. Martin opined that the person in the hypothetical did not "sound like a person" who was "involved in a psychotic state." As to the same hypothetical person, Dr. St. Martin was further asked to assume that in response to police questioning as to his motive for the killing, the person responded, "Because she was rude and telling me to leave the house," Dr. St. Martin acknowledged that the stated motive would be consistent with one based on reality as opposed to one caused by a psychotic state. Dr. St. Martin acknowledged that he did not treat [Petitioner].

Psychologist Veronica Thomas evaluated [Petitioner] and found that he suffered from paranoid schizophrenia. This type of illness affects someone's ability to process information and engage in routine decisionmaking and causes hallucinations and delusions. Such an illness, depending on several factors, can prevent someone from forming malice aforethought. A psychotic state is a period of time, whether minutes or hours or longer, wherein someone is unable to distinguish what is real from what is unreal and what is accurate from what is inaccurate. Dr. Thomas opined that [Petitioner] suffered from this kind of disorder at or around the time of the killing. Dr. Thomas acknowledged that it would be rare for a psychotic state to last simply minutes. Dr. Thomas also acknowledged that what was going

on in [Petitioner's] mind at the time of the crime remained a question as no one could "jump into a person's mind." Dr. Thomas had "no reason to believe one way or the other that [Petitioner] was in a psychotic state at the time" of the crime. The facts of the case were consistent with either presence or absence of a psychotic state. Dr. Thomas acknowledged that concealing clothing after a killing was consistent with hiding evidence of a crime as opposed to acting under a psychotic state.

## C. Rebuttal

Forensic psychiatrist Sanjay Sahgal testified that everything that a schizophrenia patient does is intentional but the act would be responsive to an altered reality. To Dr. Sahgal, a hypothetical reflecting the facts of the case, including the killing, the concealing of clothing, and the police interview, did not contain information suggesting that the person was suffering from a psychotic state. Dr. Sahgal also opined that there was nothing in the hypothetical that would suggest that the person did not intend to kill or did not understand that what he was doing was violent. One significant indication to support this conclusion was that the subject smashed the victim's head repeatedly and thereafter found a knife which he then used to stab the victim in fatal areas. The absence of data suggesting psychosis and the available data as a whole suggested that there was "no psychosis." The fact that the subject drew a diagram to the police indicating where he struck the victim in the head and where she fell was an

additional indication that he likely was not psychotically
impaired at the time of the crime. Dr. Sahgal testified
that schizophrenia is serious enough that symptoms of it are
usually visible. Dr. Sahgal testified that if violence was
motivated by delusion, the subject usually would give a
reason for the crime that is grounded in the delusion. For
schizophrenia patients, the notion that they would have an
hour of psychosis is absurd to Dr. Sahgal. The psychotic
state would last on the order of days to weeks.

Dr. Sahgal testified that the prosecution's
hypothetical could be converted to one that showed someone
acting out of psychosis by adding a few facts. Dr. Sahgal
acknowledged that there was no way to be certain whether one
was acting out of psychosis or not for any given time.

(Lodged Document No. 7 at 2-9 (footnotes renumbered).)

IV.

STANDARD OF REVIEW

The standard of review in this case is set forth in 28 U.S.C.
§ 2254:

An application for a writ of habeas corpus on behalf of a
person in custody pursuant to the judgment of a State court
shall not be granted with respect to any claim that was
adjudicated on the merits in State court proceedings unless
the adjudication of the claim--

(1) resulted in a decision that was contrary to, or
involved an unreasonable application of, clearly established
Federal law, as determined by the Supreme Court of the
United States; or

13

1  (2) resulted in a decision that was based on an

2  unreasonable determination of the facts in light of the

3  evidence presented in the State court proceeding.

4  28 U.S.C. § 2254(d).

5  A state court decision is "contrary to" clearly established

6  federal law if it applies a rule that contradicts Supreme Court case

7  law or if it reaches a conclusion different from the Supreme Court's

8  in a case that involves facts that are materially indistinguishable.

9  *Bell v. Cone*, 535 U.S. 685, 694 (2002). To establish that the state

10 court unreasonably applied federal law, a petitioner must show that

11 the state court's application of Supreme Court precedent to the facts

12 of his case was not only incorrect but objectively unreasonable.

13 *Renico v. Lett*, 559 U.S. 766, 773 (2010). Where no decision of the

14 Supreme Court has squarely decided an issue, a state court's

15 adjudication of that issue cannot result in a decision that is

16 contrary to, or involves an unreasonable application of, clearly

17 established Supreme Court precedent. *See Harrington v. Richter*, 562

18 U.S. 86, 101 (2011).

19 The claims raised in the instant Petition were raised in the

20 California Supreme Court, but that court did not issue a written

21 decision explaining why it was denying them. (Lodged Document Nos. 8-

22 9, 12-16.) Ground One was discussed by the California Court of Appeal

23 in its written decision affirming Petitioner's conviction on direct

24 appeal. (*See* Lodged Document No. 7.) Grounds Two and Three were

25 rejected by the Los Angeles County Superior Court in a reasoned

26 decision on collateral review. (*See* Docket No. 31, Exh. G.) This

27 Court presumes that the state supreme court rejected all three claims

28 for the same reasons the lower state courts did. The Court,

14

therefore, looks to the lower courts' reasoning and will not disturb it unless it concludes that "fairminded jurists" would all agree that the decision was wrong. *Richter,* 562 U.S. at 102; *see also Johnson v. Williams*, 568 U.S. 289, 297 n.1 (2013) (approving reviewing court's "look through" of state supreme court's silent denial to last reasoned state-court decision); *Bonner v. Carey,* 425 F.3d 1145, 1148 n.13 (9th Cir. 2005) (applying *Ylst* look-through doctrine to superior court's reasoned denial of habeas petition when California Court of Appeal and California Supreme Court summarily denied subsequent petitions).

V.

DISCUSSION

A. Insufficient Evidence

In Ground One, Petitioner claims that the evidence at trial was insufficient to convict him of second degree murder because his unrebutted statements to police demonstrate that he simply "lost control" after the victim attempted to kick him out of her house and that his "unthinking" action of killing her only amounted to heat-of-passion voluntary manslaughter. (Petition at 10-11.) Petitioner contends that the jury had no choice but to accept his "honest account of the incident to the police," i.e., that he acted "unknowing[ly]" and "unintentional[ly]" when he killed Kim following a "sudden and violent argument" in the kitchen after Kim belittled him. (*See* Reply at 4.)

Petitioner is simply mistaken. The jury was free to accept or reject Petitioner's story in whole or in part. *United States v. Clevenger*, 733 F.2d 1356, 1359 (9th Cir. 1984); *see also Digsby v. McNeil*, 627 F.3d 823, 832 (11th Cir. 2010) ("It is well-established that a jury may believe a witness's testimony in whole or in part.").

Clearly, the jury rejected that portion of Petitioner's story in which he claimed that he killed Kim in the heat of passion. The evidence supports the verdict and, as such, will not be overturned.

To the extent that Petitioner is arguing that there was not enough evidence to establish that he acted with malice, this argument, too, is undermined by the record. As the state appellate court explained:

> [Petitioner] stated that he killed Kim because she took away his key, was rude and verbally abusive and had told him in a belittling tone to live with his mother in Korea. He also stated that Kim had seen him getting out marijuana several days earlier, that they had talked about not seeing each other several days earlier, and that his key was taken away the day before.
>
> The jury could reasonably conclude that in the circumstances of the case the verbal abuse and belittling tone would not naturally arouse heat of passion in an ordinarily reasonable person. Moreover, there was substantial evidence to support the conclusion that [Petitioner] did not subjectively kill Kim in a heat of passion. [Petitioner] had threatened to kill Kim in the morning and again in the early afternoon, and left for almost two hours before returning to the house and arguing with and killing Kim. Although [Petitioner] contends that he acted "unknowingly" or "unconsciously" when he killed Kim, he was able to describe and draw for the police in some detail hitting Kim against the wall and stabbing her in the kitchen.

> While the testimony of a single witness, such as the
> defendant, can constitute substantial evidence requiring the
> court to instruct on heat of passion provocation . . .
> determining the weight and credibility of the witness is a
> task solely for the jury.

(Lodged Document No. 7 at 11-12 (internal citations omitted).)

The state court's rejection of this claim was sound and is supported by the record. For this reason, it will not be overturned. *See Jackson v. Virginia*, 443 U.S. 307, 324 (1979) (explaining, to prevail on insufficiency claim, defendant must show that, considering the trial record in a light most favorable to the prosecution, "no rational trier of fact could have found proof of guilt beyond a reasonable doubt"); *see also Juan H. v. Allen*, 408 F.3d 1262, 1274-75 (9th Cir. 2005) (noting, in habeas, federal court reviews state court's rejection of insufficiency claim "with an additional layer of deference," granting relief only when the state court's judgment was contrary to or an unreasonable application of *Jackson*).

B.   <u>Ineffective Assistance of Counsel</u>

In Grounds Two and Three, Petitioner claims that trial counsel was ineffective for failing to elicit direct testimony from his expert witness, Dr. St. Martin, that Petitioner was in a "psychotic state" when he killed Kim. (Petition at 12.) He also contends that trial counsel was deficient for failing to request a lesser included jury instruction (involuntary manslaughter). (Petition at 15.) These claims are without merit.

In order to prevail on a claim of ineffective assistance of counsel, Petitioner has to establish: (1) counsel's performance fell below an "objective standard of reasonableness" under prevailing

17

professional norms; and (2) the deficient performance prejudiced the defense, i.e., "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *See Strickland v. Washington*, 466 U.S. 668, 687-88, 694 (1984).

### 1. Expert Witness Testimony

In his defense, Petitioner offered the testimony of Dr. St. Martin, a licensed psychiatrist. (Reporter's Transcript ("RT") 2106-09.) Dr. St. Martin examined Petitioner after his arrest and diagnosed him with schizophrenia. (RT 2109-11.) Dr. St. Martin opined that schizophrenics can still form "malice aforethought" unless they are suffering an acute relapse and in a "psychotic state." (RT 2112-14.) After identifying the symptoms of a person in a psychotic state, Dr. St. Martin testified that he believed that Petitioner was suffering from schizophrenia at the time of the killing. (RT 2114-16.) He further explained, in response to a hypothetical question about Petitioner's conduct that day, that Petitioner's actions showed signs of someone who was in a psychotic state. (RT 2132-35.) Nevertheless, he conceded that it was impossible to know "what was exactly in [Petitioner's] mind" at the time he killed Kim. (RT 2133.) Further, Dr. St. Martin admitted that some of Petitioner's actions-- such as telling the police that he killed Kim because she was rude and because she kicked him out of the house--suggested that he was not in a psychotic state. (RT 2130-31.)

Petitioner contends that counsel's examination of Dr. St. Martin was deficient because he did not make clear to the jury that Dr. St. Martin believed that Petitioner was in a psychotic state when he killed Kim. (Petition at 12.) In support of this claim, Petitioner

18

has included a declaration from Dr. St. Martin stating that he "did not have the opportunity to inform the jury that [Petitioner] suffered a psychotic episode" and, thus, the jury was deprived of understanding that Petitioner's behavior that appeared to be rational may not have been. (Petition, Exh. A.)

The Los Angeles County Superior Court rejected this claim on the grounds that Petitioner had not established that counsel was deficient or that Petitioner suffered prejudice:

> Petitioner . . . offers no explanation as to how the questioning fell short or how counsel could have brought out this opinion. [Petitioner] also fails to discuss the fact that Dr. Saint Martin did in fact opine in response to a hypothetical involving a person who, as a result of verbal abuse over a period of "a day or two," yelled, threw things randomly, and broke glassware, that the hypothetical subject showed signs of a person being in a psychotic state.
>
> Additionally, [Petitioner] has failed to show prejudice . . . . First, it is mere speculation on [Petitioner's] part that any further testimony on the question of a psychotic state would have been admissible. Second, the subject of [Petitioner's] sanity at the time of the crime was fully explored in the sanity phase of the trial where the jury found that [Petitioner] was legally sane at the time of the offense.[4]

(Docket No. 31, Exh. G (internal citation omitted).)

---

[4] At Petitioner's first trial, he was found to be sane when he committed the murder. (*See* Lodged Document No. 5 at 3-4.) That finding was not overturned on appeal.

1    The Court agrees that counsel was not ineffective.  At best,

2    Petitioner's claim that counsel was deficient in his questioning of

3    Dr. St. Martin is one of degree, not kind.  Petitioner does not

4    suggest that counsel failed to proffer a diminished capacity defense

5    based on Dr. St. Martin's testimony that Petitioner was a

6    schizophrenic who could have suffered a psychotic episode at the time

7    of the killing.  Rather, he suggests that counsel's examination failed

8    to make clear that Dr. St. Martin believed that Petitioner was in a

9    psychotic state when he killed Kim.  The Court disagrees.  In response

10   to counsel's questioning, Dr. St. Martin explained how Petitioner's

11   actions could be consistent with a schizophrenic in the throes of a

12   psychotic episode and hence not acting with malice.  (RT 2132-35.)

13   Considering the whole of the examination, counsel acted within the

14   range of competence expected of attorneys in presenting expert witness

15   testimony.  *See Dows v. Wood*, 211 F.3d 480, 487 (9th Cir. 2000)

16   (finding "counsel's representation must be only objectively

17   reasonable, not flawless or to the highest degree of skill").

18       Moreover, the state court's conclusion that there was no

19   prejudice from counsel's examination of Dr. St. Martin was reasonable.

20   Dr. St. Martin's declaration offers no additional evidence supporting

21   his belief that Petitioner was in a psychotic state at the time of the

22   killing.  Nor does it undermine his trial testimony that it was

23   impossible to know Petitioner's state of mind when he committed the

24   crime.  (RT 2133.)  This fact was reinforced by the other two doctors

25   (Drs. Sahgal and Thomas) who also testified that it was impossible to

26   be certain whether a person's actions were the result of a psychotic

27   state.  (RT 2156, 2167, 2194-95.)  In fact, all three doctors agreed

28   that some of Petitioner's statements to the victim and the police

suggested that he was not delusional when he killed Kim.  (RT 2130-31, 2162-63, 2182-83.)  Thus, it is not reasonably likely that additional testimony by Dr. St. Martin would have changed the outcome of the trial.  *Strickland*, 466 U.S. at 687-88, 694.  For these reasons, this claim is denied.

    *2. Jury Instructions*

    At the close of the evidence, the trial court instructed the jury on second degree murder--which required a showing of malice aforethought--and voluntary manslaughter--which did not and would apply if the jury found that Petitioner killed Kim in the heat of passion.  (CT 154-55.)  The court did not, however, instruct the jury on involuntary manslaughter.  It appears that Petitioner's counsel never requested such an instruction.  Petitioner claims that counsel was ineffective for failing to do so.  There is no merit to this claim.

    In California, involuntary manslaughter is generally defined as the unlawful killing of a human being without malice.  *See* Cal. Penal Code § 192.  Malice is implied when the defendant engages in conduct which could naturally lead to danger to life or acts with a conscious disregard for life.  *People v. Chun*, 45 Cal.4th 1172, 1181 (2009).  A defendant is entitled to an involuntary manslaughter instruction on a diminished capacity theory when evidence demonstrates that he suffered from a mental illness at the time of the crime and, because of that mental illness, did not act with malice and did not intend to kill. *See People v. Nelson*, 1 Cal.5th 513, 555-56 (2016).

    Petitioner argues that, based on Dr. St. Martin's testimony, he may have been in a "psychotic state at the time of the killing" and, thus, lacked the mental capacity to "conscious[ly] diregard" Kim's

life when he stabbed her.  (Petition at 16.)  The Los Angeles County
Superior Court, however, rejected this claim because Petitioner had
not demonstrated that he was prejudiced from counsel's failure to
request the involuntary manslaughter instruction:

> [Petitioner] has failed to show that there was any
> evidence that would support the trial court giving the
> involuntary manslaughter instruction.  In [Petitioner's]
> argument, the petition quotes from "[P]eople v. [C]leaves"
> (1991) 229 [C]al. App. 3d 367[,] which states, "if the
> defendant commits an act which endangers human life without
> realizing the risk involved, he is guilty of involuntary
> manslaughter . . . [.]"  [I]t appears that [Petitioner] is
> arguing that his mental illness prevented him from realizing
> that stabbing the victim several times in the chest would
> endanger human life.  The argument fails for several
> reasons.  First, there is no evidence from the testimony of
> any of the expert witnesses that testified that this is the
> case.  Second, even if there had been some discussion on it,
> it would be pure speculation that the evidence would rise to
> the level that would require the court to give the
> involuntary manslaughter instruction.

(Docket No. 31, Exh. G.)

Here, again, the Court agrees.  There was no persuasive evidence
that Petitioner was suffering from some type of mental delusion that
would have negated a finding that he acted with malice when he banged
Kim's head through the wall and stabbed her with a knife six times.
Although Dr. St. Martin testified that Petitioner suffered from
schizophrenia, he admitted that schizophrenia does not "necessarily

prevent a person from forming a mental state of malice aforethought."
(RT 2111-12, 2121.)  Moreover, in response to hypotheticals based on
the facts of the case, he also admitted that some of Petitioner's
actions--such as his admission to police that he killed Kim because
she was rude and kicked him out of the house--made it less likely that
Petitioner was in a psychotic state and acted without malice when he
killed her.  (RT 2130-31.)  Finally, Dr. St. Martin concluded his
testimony by explaining that he was unable to definitively assess
Petitioner's state of mind because he was not there at the time.  (RT
2138.)

Other evidence at trial also undercut any argument that
Petitioner did not realize that he was endangering Kim's life when he
slammed her head against the wall and stabbed her.  For example,
Petitioner fled the murder scene, intending to kill himself for what
he had done.  (RT 1841; CT 85.)  He made efforts to hide from
authorities by hiding out in several hotels with his former
girlfriend.  He also told his former girlfriend that he had killed
Kim.  And, before being told by police why he was under arrest, he
asked one of them if Kim was dead.  (RT 1812-13.)  He then explained
to police that the reason he had killed Kim was because she had ended
their relationship, forced him out of her house, and ridiculed him in
the process, not because he had had a psychotic break.

In light of the dearth of evidence that Petitioner was unable to
form the requisite mental state for second degree murder, there is no
reasonable possibility that the trial court would have given an
involuntary manslaughter instruction, even if counsel had requested
one.  Trial counsel's "failure to take a futile action can never be
deficient performance."  *Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir.

1996); *see also Cain v. Chappell*, 870 F.3d 1003, 1019 (9th Cir. 2017)

("[I]t is not ineffective for counsel to refrain from pursuing jury

instructions that have no basis in the evidence."). Further, even if

the court had given an involuntary manslaughter instruction, there is

absolutely no reason to believe that it would have altered the jury's

verdict. As such, counsel's inaction could not have prejudiced

Petitioner. *See Pirtle v. Morgan*, 313 F.3d 1160, 1179 (9th Cir. 2002)

(finding no prejudice under *Strickland* because, even if "counsel erred

by failing to seek a diminished capacity instruction," there was "no

reasonable probability" that it affected the verdict). Accordingly,

this claim must be denied.

VI.

CONCLUSION

For these reasons, the Petition is denied and the action is

dismissed with prejudice. Further, because Petitioner has not made a

substantial showing of the denial of a constitutional right, he is not

entitled to a certificate of appealability. See 28 U.S.C.

§ 2253(c)(2); *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003); *Slack

v. McDaniel*, 529 U.S. 473, 484 (2000); *see also* Fed. R. App. P. 22(b).

IT IS SO ORDERED.

DATED: January 4, 2018.

PATRICK J. WALSH
UNITED STATES MAGISTRATE JUDGE